**Stock v. Inter**

*R. Pierson Eaton,* for plaintiffs.

*Donald S. Mervine* of *Mervine & Calderwood,* for defendants.

WOLFE, P. J., July 11, 1972.—

### ISSUE

The issue to be resolved in this case is whether defendants have breached the term of an oil and gas lease entered into with plaintiffs to the extent a forfeiture has been worked, thereby mandating a termination thereof.

## STATEMENT OF FACTS

By agreement dated April 15, 1964, the parties entered into an oil and gas lease for a term of five years and so long thereafter as production was found in paying quantities. The customary one-eighth royalty and seven-eighths working interest was vested in the lessors and lessees, respectively, of all gas and oil produced. The lease contained obligations on the part of the lessees to bury pipelines when requested by lessors below plow depth, to maintain the lease road in good condition passable for all vehicles, to clean and paint the oil tanks and jacks thereon at least once each two years, to equip each producing well with its separate pumping jack and to drill off-set wells in the event of discovery of oil on adjacent property that are drilled within 150 feet of plaintiffs' property line if the adverse well produces oil in paying quantities for 30 consecutive days.

Defendants drilled seven wells on the 76-acre lease between June 21, 1964, and January 25, 1965, at a cost of $85,000 to $95,000.

Paragraph 11 of the lease specifically provided if any well does not produce at least three barrels (of oil) per month on the average during any given period of three consecutive months, it shall be conclusively presumed that oil is not being produced in "paying quantities."

Gross production of the leasehold to date has been 29,126 barrels, with production falling off increasingly each year to 371.11 barrels in 1969. In all, there are 10 wells on the premises plus two old wells existing prior to the lease.

## DISCUSSIONS OF QUESTIONS OF LAW

It is not seriously contested by defendants they

have neglected to bury the oil lines, have failed to maintain the lease road in the best passable condition and have failed to paint the oil tanks once every two years. Defendants also acknowledge they have failed to equip each well with an electric pumping jack. These admissions are supported by the evidence. From commencement of operation to date, there has been but one pumping jack on Well Number 3 and another pumping jack was shuttled between Wells Numbers 5 and 7. Defendants justify this delinquency by stating if the wells were equipped with jacks it would cause a loss of gas pressure and the pressure that was produced would parafine the wells which, in turn, would cause a cessation in production of all oil, whereas the "flow method" permits the wells to accumulate the gas pressure by natural means and at intervals the wells are flowed, which does not cause them to parafine to the point of stoppage.

Plaintiffs admittedly did not complain about the lack of jacks on each well when production was high, which was 10,822.04 barrels in 1964, 14,078.83 barrels in 1965 and 1,913.42 barrels in 1966, 1,062.05 barrels in 1967, 653.54 barrels in 1968 and 371.11 barrels in 1969; admittedly, as production has decreased, plaintiffs' concern has increased.

Whether the wells are equipped with pump jacks or are produced by the flow method, we think is not the real pith of the matter. The lease was meticulously drawn by an attorney and spelled out in detail the intent of the parties concerning production. Here, the parties contracted that it shall be conclusively presumed that oil is not being produced in "paying quantities" if any well does not produce at least three barrels per month on the average, during any given period of three consecutive months.

The obvious purpose of having the jacks on the wells

is to permit them to produce to the maximum and, of course, if this will cause a decrease in production due to the loss of gas pressure or oil stoppage, the flow method would not be objectionable for that reason alone. The difficulty is production has fallen below "paying quantities" even by the flow method. By their formula, the parties contemplated nine barrels of oil over a three-month period from each well, which would be 36 barrels per year or a total of 360 barrels from the 10 wells. Plaintiffs contend their last royalty payment was on July 7, 1971, which was paid on the basis of 6.98 barrels. Defendants have shut in the wells during the winter and have closed some down for a period of two years to permit oil pressure to increase. In short, since 1970, production has been nominal and sporadic.

It is apparent the leasehold is marginal and was barely within the parties' "paying quantity" formula of 1969 and for the past three years has been submarginal.

It is to the obvious benefit of both parties the maximum result be obtained in production and if production is not economically feasible, it is to their benefit to cease the operations, thereby permitting the land to revert to other uses and permit defendants to remove their equipment as provided by the terms of the lease.

We are of the opinion defendants should be given an opportunity to equip the wells with the jacks and pump them in accordance with the contract. Since the "flow method" has not brought forth production to the expectation of the parties, defendants should be compelled to now either pump the wells or abandon the lease.

As to the other breaches of the contract, we cannot conclude they have been so substantial as to warrant a termination of the lease. In this regard, the maxim

"equitas sequitur legum" (equity follows the law) applies. The breaches are minor and do not go to the essence of the contract, to wit, production of oil. In addition, plaintiffs have not shown they have been in any way damaged by the failure of defendants to maintain the road in a more passable condition or by failure to bury the oil lines. The painting of the tanks was for obvious esthetic reasons. These infractions could not justify a termination either singularly or cumulatively.

As to the off-set wells, there was no evidence that any production was lost from the leasehold by virtue of the adjacent property owner's drilling operations. The wells drilled by defendants were in close proximity to the other property line upon which drilling was commenced, and we find no off-set wells per se were necessary as the wells drilled by defendants acted sufficiently to protect plaintiffs' oil in place. Thus, we conclude the equitable doctrine of substantial performance must be invoked in this case and equity will not support a forfeiture. Equity dictates, however, defendants must produce the wells in good faith. What may be a reasonable length of time to permit this is a question of fact, but considering the lease has been in effect eight years, we do not think it is unreasonable to permit an additional six months to equip the wells with pumping jacks and produce them in accordance with the terms of the lease. In the event defendants fail to pump each well by means of a jack or, after pumping production on each well is not in accordance with the paying quantities formula, then each accordingly should be terminated as production falls off. By this method the poor wells can be terminated and the good wells can be continued.

For the foregoing reasons, the court makes the following

## DECREE NISI

And now, to wit, July 11, 1972, the prayer for termination of the lease agreement between the parties under date of April 15, 1964, is denied.

Defendants are granted six months to equip each well either consecutively or concurrently with the pumping jacks and are directed to pump each well diligently within this period of time. If any well shall fail to produce nine barrels of oil over a three-month period, said well shall be terminated and defendants shall remove their equipment therein in accordance with the terms of the lease. If any well shall equal or exceed nine barrels of oil over a three-month period, said well shall be continuously pumped in accordance with the terms of the lease and at such time as production falls below the aforesaid volume, said well shall be abandoned in accordance with the terms of the lease.

Lessees shall maintain the lease road in good passable condition for vehicles, bury any lines below plow depth, if requested by plaintiffs, and if requested by lessors, paint the oil tanks, all in accordance with the terms of the lease.

Exceptions are noted to both parties and if not taken within 20 days from the filing date hereof, decree absolute.